IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| R.E.B. individually and on behalf of his minor child, J.B., <br><br>         Plaintiffs, <br><br>    vs. <br><br> STATE OF HAWAII, DEPARTMENT OF EDUCATION and KATHRYN MATAYOSHI, in her official capacity as Superintendent of the Hawaii Public Schools, <br><br>         Defendants. | CIVIL No. 13-00016 DKW-BMK (Other Civil Action) <br><br> **ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S DECEMBER 13, 2012 DECISION** |

**ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S
DECEMBER 13, 2012 DECISION**

**INTRODUCTION**

Before the Court is Plaintiffs R.E.B. ("Father"), individually and on

behalf of his minor child, and J.B.'s ("Student") (collectively, "Plaintiffs") appeal,

pursuant to the Individuals with Disabilities Education Act of 2004 ("IDEA"),

20 U.S.C. § 1400 *et seq*., from the Administrative Hearings Officer's ("Hearings

Officer") December 13, 2012 Findings of Fact, Conclusions of Law, and Decision

("Decision").  On January 10, 2014, the Court heard oral arguments on the appeal.

After careful consideration of the supporting and opposing memoranda, the administrative record, the relevant legal authority, and the arguments of counsel, the December 13, 2012 Decision is AFFIRMED.

## BACKGROUND

Student has autism and was six years old at the time of the Due Process Hearing in 2012. Student has attended Pacific Autism Center ("PAC"), a small private school for students with autism and other special needs, since March 2010. The Department of Education, State of Hawaiʻi ("DOE"), has been paying approximately $17,000.00 per month for Student's attendance at PAC. Student's DOE home school at the time of the Due Process Hearing was Koko Head Elementary School.

This appeal centers on Student's May 9, 2012 Individualized Education Program ("IEP"), which was prepared prior to Student's kindergarten year. The IEP provided Student with special education, occupational therapy, speech and language therapy, transportation, and a variety of other supplementary aids and services, program modifications, and supports. Pet. Ex. 1 (IEP) at 020. The IEP also provided Student with an extended school year ("ESY") consisting of the following:

- Special Education services that will be provided at 420 minutes a day
- One-to-one adult support services that will be provided at 420 minutes a day

2

- Speech/Language Therapy direct service that will be provided at 30 minutes per week
- Occupational Therapy consultation that will be provided at 30 minutes per month
- BISS services that will [be] provided at 900 minutes a week
- Autism Consultation services that will be provided at Special Education teacher's request
- Curb-to-curb bus transportation services will be provided to and from school daily

*Id.*

To collaboratively develop the IEP, the IEP team held meetings on January 13, February 13, March 28, April 25, May 7, and May 9, 2012. A transfer/transition meeting was also subsequently held on June 13, 2012.

In terms of Student's mainstreaming, the IEP established that:

[Student] will not participate with non-disabled peers for Reading, Writing, Math, Science, Social Studies, Speech/Language Therapy and Occupational Therapy.
[Student] will participate with non-disabled peers for Library, Music, PE, Art, Computer, Hawaiian Studies, Mandarin, recesses, lunch, field trips, assemblies and school-wide activities.
[Student] will also receive specialized instruction in the general education setting for Science and Social Studies activities as deemed appropriate by his Special Education teacher/Care Coordinator and General Education teacher.
[Student] will receive services in a combination Special Education and General Education setting on a DOE public school campus.

*Id.* at 022. In a notice to Parents following the May 9, 2012 IEP meeting, the DOE summarized the IEP team's rationale for Student's placement, explaining that:

> Based on the team's discussion, [Student's] least restrictive
> environment is in a combination of Special Education and
> General Education classes. Participation in the Special
> Education environment will support [Student] with specially
> designed instruction to acquire targeted skills to meet his needs
> in the areas of Reading, Writing and Math.
> The General Education curriculum (that has been modified) and
> environment will provide him with access to typically
> developing peers and appropriate role models to develop and
> generalize social skills. Additionally, participation in the
> General Education environment will provide exposure to and
> the ability to gain increased tolerance to stimuli in various
> settings and allow him to generalize learned skills while
> actively participating in classroom activities.

Resp. Ex. 8 (May 14, 2012 Prior Written Notice) at 000265.

On June 7, 2012, Plaintiffs submitted a Request for Due Process

Hearing. Pet. Ex. 2 (Due Process Request) at 032–038. On December 13, 2012,

the Hearings Officer issued his Decision after holding a due process hearing on

September 24–26, 2012. The Hearings Officer concluded that the IEP did not deny

Student a free and appropriate public education:

> Specifically, Petitioners have not shown that the program
> offered through the May 9, 2012 IEP did not meet Student's
> need, did not provide the services agreed upon at the IEP
> meetings, or that the transition meeting subsequent to the May
> 9, 2012 IEP was improper. Further, Petitioners have not shown
> that the placement offered through the May 9, 2012 IEP was
> not an appropriate placement in the LRE, or that the placement
> decision was improperly delegated. Additionally, Petitioners
> have not shown that the DOE had a duty to discuss the
> methodology it would use or the location for the 2012 ESY
> services.

Decision at 27.

Plaintiffs' subsequent appeal of that Decision is presently before the Court.

## STANDARD OF REVIEW

### I.    IDEA Overview

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs." *Hoeft ex rel. Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)). It ensures that "all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). The IDEA defines FAPE as special education and related services that—

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine

5

whether that student is eligible for special education, and formulate and implement an IEP. 20 U.S.C. § 1414. The IEP is to be developed by an "IEP Team" composed of, *inter alia*, school officials, parents, teachers and other persons knowledgeable about the child. 20 U.S.C. § 1414(d)(1)(B).

"Procedural flaws in the IEP process do not always amount to the denial of a FAPE." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009) (citations omitted). Once a procedural violation of the IDEA is identified, the court "must determine whether that violation affected the substantive rights of the parent or child." *Id.* (citations omitted). "[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *Id.* (alteration in original) (citations and quotation marks omitted).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education. *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted). Rather, school districts are required to provide only a "'basic floor of opportunity.'" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 201 (1982)). The FAPE need only be "appropriately

designed and implemented so as to convey [the][s]tudent with a meaningful benefit." *Id.* at 433 (citations and quotation marks omitted).

## II.     <u>Standard of Review</u>

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the court—
>
>> (i) shall receive the records of the administrative proceedings;
>>
>> (ii) shall hear additional evidence at the request of a party; and
>>
>> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the administrative proceedings. *Capistrano*, 556 F.3d at 908 (quoting *Rowley*, 458 U.S. at 206) (some citations omitted). The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (citing *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)). In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said

findings are "'thorough and careful.'" *Capistrano*, 556 F.3d at 908 (quoting

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

The district court should give "substantial weight" to the hearings

officer's decision when the decision "evinces his careful, impartial consideration of

all the evidence and demonstrates his sensitivity to the complexity of the issues

presented." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d

1458, 1466–67 (9th Cir. 1996) (citation and quotation marks omitted). "[T]he

ultimate determination of whether an IEP was appropriate," however, "is reviewed

de novo." *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist*., 627 F.3d 773, 778

(9th Cir. 2010) (citing *Wartenberg*, 59 F.3d at 891).

A court's inquiry in reviewing IDEA administrative decisions is

twofold:

> First, has the State complied with the procedures set forth in the
> Act? And second, is the individualized educational program
> developed through the Act's procedures reasonably calculated
> to enable the child to receive educational benefits? [*Rowley*,
> 458 U.S. at 206–07] (footnotes omitted). If these requirements
> are met, the State has complied with the obligations imposed by
> Congress and the courts can require no more. *Id.* at 207.

*J.L. v. Mercer Island Sch. Dist*., 592 F.3d 938, 947 (9th Cir. 2010) (some citations

omitted).

The burden of proof in IDEA appeal proceedings is on the party

challenging the administrative ruling. *Hood v. Encinitas Union Sch. Dist*., 486

F.3d 1099, 1103 (9th Cir. 2007) (citations omitted).  The challenging party must

show, by a preponderance of the evidence, that the hearing decision should be

reversed.  *J.W.*, 626 F.3d at 438 (citation omitted).

## DISCUSSION

Plaintiffs' arguments on appeal focus largely on what they believe

should have occurred at the IEP meetings, but allegedly did not.  Plaintiffs do not

challenge the adequacy of the Present Levels of Educational Performance

("PLEPS") section of the IEP or the annual measurable goals and objectives that

are contained in the IEP.  Instead, Plaintiffs contend that the Decision erroneously

determined that:  (1) transition services did not need to be discussed as part of the

IEP meetings, and thus the DOE did not disregard Father's concerns regarding the

impact of Student's new placement; (2) Student was not denied a FAPE when the

DOE did not discuss the location of ESY services in developing the IEP; (3) the

DOE did not fail to include agreed-upon elements in the IEP; (4) the DOE did not

need to identify a methodology in the IEP; and (5) the DOE held an appropriate

discussion of Student's least restrictive environment and sufficiently designated

Student's placement.

The Court concludes that Plaintiffs have not satisfied their burden of

showing that the Decision should be reversed for any of the aforementioned

reasons, and therefore affirms the Decision.  Each of Plaintiffs' contentions on appeal is discussed in turn below.

## I.     Father's Concerns Regarding the Impact of Student's New Placement

Plaintiffs contend that Father was prevented in the IEP meetings from discussing the impact of the change in Student's placement from PAC to Koko Head Elementary.  The DOE counters that the issues raised by Father were transition-oriented, and thus did not need to be part of the IEP meetings.  Instead, the DOE asserts that Father's concerns would have been more appropriately addressed in the June 2012 transition meeting, and the DOE was fully prepared to discuss those concerns at that time.  The Court agrees with the DOE.

Plaintiffs point to a particular dialogue at the May 7 IEP meeting intended to exemplify Parents' inability to discuss what Student's potential needs might be due to change in placement.  Open. Br. at 4.  In fact, the full discussion that occurred there shows that Father's concerns at that time were transition-related.  The dialogue occurred in the context of a discussion by the IEP team related to the options for providing transportation for Student:

> **Principal:**  Do you know how he might respond to, I'm just
> curious, in the, um, if he were picked up by a bus, how he
> might respond to that?  I'm sure transition, of course, would
> need to be considered, but based on your experiences, how do
> you think he might, um, respond?

**Father:**  Um, it's outside my and his experience and generally, I'm concerned about how he would react individually to a transition from one placement to another.  On the bus as well.

**Principal:**  So that's something I feel comfortable offering, transportation for [Student], and you know, like anything else, we will have to anticipate and try our best to anticipate some of his needs as he transitions to a different environment, different settings, of which includes the bus.

. . .

**Principal:**  Maybe we can next go in to extended school year then.

**Father:**  Ok, I'd like to talk about the transition, is that not today?

**Principal:**  Ok, so, what I would like to do [Father,] and like to have the IEP team consider, is that I would like to finish developing the IEP, and if by chance we are able to, say, finish today, which certainly would be a goal, then perhaps use Wednesday, this coming Wednesday, as a time to talk about the transfer and transition needs for [Student].  And that does not necessarily, does not have to be part of the IEP, I mean in terms of needing to have an IEP meeting for that purpose, but from my standpoint, that is definitely something we should meet about.  I don't believe it needs to be in the actual IEP, but certainly we do need to meet with many of the team members.  Does that kind of answer your question?  So let's try to, I do want us to address it, but not within the IEP.  If there is anything that needs to be modified or added or changed in the IEP, then we'll need to convene an IEP meeting for that purpose.  I remember there was two options, two possible ways that were brought up, I think your counsel had mentioned two possible things and I've been reflecting on it.  I'd prefer to fully develop the IEP and then hold a meeting once the IEP is finished, for that purpose.

Pet. Ex. 62 (May 7 IEP Meeting Audio) at 21:57–26:07. As the Hearings Officer concluded, the issues raised by Father in this dialogue were transition issues to be discussed in a transition meeting after the IEP was developed. Decision at 20.

Plaintiffs concede that transition issues are appropriately discussed at transition/transfer plan meetings, but emphasize that the DOE was required to address *at the IEP meeting* Father's concerns "regarding the impact a change in his son's educational program would have during the development of his IEP." Open. Br. at 3; *see* Resp. Ex. 31 (May 25, 2012 letter from Father to Principal) ("I continue to disagree that any and all discussion of [Student's] individual needs due to a change in placement should be delayed until after an offer of FAPE has been completed and made, and continue to believe that a discussion of his individual needs with respect to those services are a component of his IEP and should have been discussed."); Resp. Ex. 1 (Due Process Request) at 3, ¶ 2.A. ("Father sought a discussion about his concerns regarding how a change in placement and program might impact his son. Father had wished to raise and discuss what kind of services, modifcation to content, methodology and/or instruction and placement could address these concerns."). This is a distinction without a difference.

It is well-settled that "the IDEA does not require an IEP to address transition services except under a limited set of circumstances not applicable to this action." *Donna S. v. DOE*, 2012 WL 4017449, at *7 (D. Haw. Sept. 12, 2012).

12

Father's concern as to the impact of a change in placement on Student is the exact type of issue that a transition meeting is designed to address. "[I]t makes sense that an IEP would not include discussion of transition services—a transition plan governs the discrete issue of transferring a student from one school to another, while an IEP outlines yearly goals for a student." *Id.* at *9.

Plaintiffs only point to the one specfic dialogue discussed above as evidence of the DOE's failure to address Father's change in placement concern. However, in that dialogue from the May 7 IEP meeting, Father expressed his desire to discuss "transition," and specifically, his concern related to Student's "transition from one placement to another." Pet. Ex. 62 (May 7 IEP Meeting Audio) at 21:57–26:07. Plaintiffs' attempts to now characterize these concerns as something other than a concern over "transition" are unavailing. Father's concerns were specifically focused on the impact of the change from PAC to Koko Head Elementary, an issue to be covered in a transition/transfer meeting and an issue that the DOE clearly acknowledged would be covered at such a meeting.

Further, Plaintiffs only cite to authority requiring appropriate consideration of parental participation on the IEP team. There is no evidence, however, that Plaintiffs were not permitted to participate in the development of the IEP or the transition plan, and Plaintiffs do not challenge the subsequent transition/transfer plan. Indeed, the DOE held six separate IEP development

meetings, and Parents attended every one of them.  The DOE also held a separate

transition meeting in June 2012, which Parents also attended.  There is simply no

evidence that the DOE disregarded parental transition concerns by merely

deferring that discussion to a post-IEP transition meeting.

## II.    **Placement During ESY**

Plaintiffs contend that in developing the IEP, the DOE denied Student

a FAPE by inadequately defining what the ESY placement would look like.  The

DOE counters that such specificity was not required within the IEP, citing to *DOE*

*v. Z.Y.*, 2013 WL 6210637, at *13–14 (D. Haw. Nov. 27, 2013).  Because the Court

agrees with the reasoning and conclusion in *Z.Y.*, the DOE's handling of Student's

ESY placement did not violate the IDEA.

At the May 9 IEP meeting, the IEP team discussed and finalized

Student's receipt of ESY, as subsequently set forth in the IEP.  *See* Pet. Ex. 1 (IEP)

at 020; Pet. Ex. 63 (May 9 IEP Meeting Audio) 50:10–51:27 (summarizing the

services that are provided in the IEP).  As part of that discussion, Father inquired

into the details of Student's placement during ESY, to which the Principal

explained:

> For ESY, for this summer [2012], we don't have a general
> education summer school at this site [Koko Head Elementary].
> In general, we would rotate elementary schools and the
> complex would have a rotation of general education sites.  So
> this year, it's not Koko Head.

Pet. Ex. 63 (May 9 IEP Meeting Audio) 42:28–42:54; *see* Decision at 12

¶ 74 ("The ACT clarified that the DOE rotates which school in a complex

will provide ESY services.").  Regardless of the specific location of the

general education site for ESY, the IEP team had decided that Student

should begin transitioning from PAC during ESY.  The Principal discussed

the importance of a summer transition, even though the details remained to

be worked out:

> From my point of view, and this is some discussion too that we could have when we meet for the transfer plan meeting, we need to consider that he is at PAC right now.  And so when you look at that and his needs, I do worry, and we need to have some thought about, how we, as a team, plan for having him come to our school.  It may be such that, based on his needs, the less moving parts the better.  From my vantage point, it may not be the most appropriate at this point in time to bring him right in with a general ed. summer school that's not at our site.  From my vantage point, it might make more sense to have him gradually acculturated into our school environment, during the summer time, over time, maybe having more experience here, make it gradual, so we consider his unique needs.  And that's something that it's hard for me to say [Father] that, okay, ESY will definitely look like this.  But that is why as a team, after I offer FAPE, I would like to meet with you and your wife (it wouldn't be considered an IEP team meeting), but to talk about transfer, the things that we need to consider, your son's unique needs, for such a significant transition from going from PAC to say, Koko Head Elementary.  There [are] certainly many factors that we need to consider, but I believe that we can collectively come up with some really positive action and implementation plan for the eventual transfer for [Student].
>
> . . .

> So, your question about ESY, what that might look like, it could look like many different things. At the transfer plan meeting that I definitely want to have with you and your wife, those are some things that we can discuss and make decisions on.

Pet. Ex. 63 (May 9 IEP Meeting Audio) at 46:47–49:00. Given the fact that Student would transition over the ESY period, it was not a denial of FAPE to not have the specific placement details in place as part of the IEP.

Similar to this case, in *Z.Y.*, the student was provided ESY services in his IEP, but the principal was unable to provide parents with the details of such a placement at that time. *DOE v. Z.Y.*, 2013 WL 6210637, at *4. Nevertheless, Judge Kobayashi concluded that there was no denial of FAPE where even the IEP team did not yet know what type of program would be available at the home school during ESY. *Id.* at *14 ("The Court finds that the lack of discussion regarding whether Student would receive inclusion opportunities during his ESY program, before the IEP team had sufficient information that such programs even exist, did not amount to a procedural violation of the IDEA."). Here, the IEP provided Student with ESY, including the number of hours and services he would receive. There was no denial of FAPE by not having additional ESY placement details at

the ready at the IEP stage.  *Id.* (citing *T.M. ex rel. A.M. v. Cornwall Central Sch. Dist.*, 900 F.Supp.2d 344, 352–53 (S.D.N.Y. 2012)).[1]

## III.    Agreed-upon Elements

Plaintiffs assert that Student was denied a FAPE because the IEP omitted an agreement by the IEP team that Student's 1:1 aide would have the same qualifications as a contracted skills trainer.  The DOE countered at the hearing that there never was such an agreement.  The Court concludes that Plaintiffs have not satisfied their burden of demonstrating that there was a definite agreement on the qualifications of a 1:1 aide.  Moreover, even if there was an agreement, the omission of that agreement from the IEP was a *de minimis* procedural violation, and thus did not result in a denial of FAPE.

In reviewing the record, it is unclear what, if anything, was agreed to in terms of the qualifications for the 1:1 aide.  At the April 25 IEP meeting, the following dialogue occurred:

> **Father**:  All the "w" questions about the autism consultation and the one-to-one adult support, you know, who is going to be doing it, what's their training going to be, what do they have to meet [Student's] specific needs, it's tough to put any meat on the bones of the autism consultant and the one-to-one adult support.

---

[1]The Court notes that Plaintiffs do not expressly address the Hearings Officer's primary determination that the location of ESY services does not need to be specified in the IEP pursuant to HAR § 8-60-44(a)(7).

> **Unidentified DOE member of IEP team**:  But I guess with what Mr. Peck wanted in the clarification of supports is that the request for proposal is what we would be looking at, that we would be following that guideline.
>
> **Mr. Peck**:  Oh yeah.  So the request for proposal talks about the training and supervision of individuals that work with [Student].  So that is going to apply to both the one-on-one paraprofessional, . . . that is going to apply to both the autism consultant and the paraprofessional.
>
> **DOE IEP team member**:  Yes.
>
> **Mr. Peck**:  Okay.  That defines their qualifications and training, so that much is defined by the RFP.

Pet. Ex. 61 (April 25 IEP Meeting Audio) 2:11:24–2:12:39.  Further, the DOE special education teacher testified that the qualifications of the 1:1 aide was actually something the DOE could not guarantee at the time of the IEP because it involved getting the right approvals.  Hearing Tr. 259:4–11.  Father's notes from the April 25 IEP Meeting are similarly ambiguous and mirror his counsel's comments from the meeting.  Pet. Ex. 34 (Father's April 25 IEP Meeting Notes) at 278 ("Guideline in the RFP applies to autism consultant and paraprofessional.").  Accordingly, the Plaintiffs have failed to satisfy their burden of showing a defined agreement as to the qualifications of the 1:1 aide.

Even if there was an agreement, the Court concludes that omitting that agreement in the IEP was a *de minimis* procedural violation that did not result in the loss of educational opportunity or infringe on Parents' opportunity to

participate in the IEP process. *See Capistrano*, 556 F.3d at 909. The special education teacher's testimony was unequivocal that the DOE was in fact seeking to get district approval to ensure that Student's 1:1 aide did meet the qualifications of a contracted service provider. Hearings Tr. at 259:12–260:19. Plaintiffs have provided no evidence that the district did not approve the request, and there is nothing to indicate that the failure to include this agreement in the IEP had any actual impact on Student's educational opportunity or Parents' participation in the IEP process.

## IV.   Lack of Specific Methodology in the IEP

Plaintiffs contend that the IEP was deficient because, although the IEP team determined in meetings that the methodology of Applied Behavioral Analysis ("ABA") would be used in servicing Student, the IEP failed to specify that methodology. Because Plaintiffs have failed to show an agreement as to any particular methodology and because, as the Hearings Officer concluded, there is no requirement in any event to specify a methodology in an IEP, Plaintiffs' contentions lack merit.

Although Plaintiffs claim that the IEP team determined that Applied Behavioral Analysis would be the methodology for providing services to Student, the proceedings evidence no such agreement:

> **Mr. Peck**: Are we going to broach the subject of methodology?

19

. . .

> **Principal**:  I don't think we're required to specify methodology in a[n] IEP document.  That doesn't necessarily mean that discussion can't occur for anything.  Anything a parent or an IEP team member wants to bring it up, go ahead and bring it up, right?

> **Mr. Peck**:  To tell you the truth, I don't know if you're required to do it in an IEP document either.  But my reading of the law is that someday, with the appropriate emphasis, the Ninth Circuit will agree with me that you are required to do it.

> . . .

> **Unidentified DOE IEP Team Member**:  But I guess you're entitled to share whatever your thoughts and concerns are.

Pet. Ex. 61 (April 25 IEP Meeting Audio) 2:09:41–2:11:06.  In fact, Plaintiffs' own record citations offer no evidence of such an agreement.  Open. Br. at 18; Pet. Ex. 62 (May 7 IEP Meeting Audio) 1:58:07 ("We usually don't identify specific methods simply because, I understand fully what you're saying with respect to the program you have in place for him, but if he were to access the gen. ed. class, he would probably be provided with different strategies; ABA would not be the only strategy he would be receiving throughout the day.").

Moreover, beyond the absence of an agreement on methodology, the Hearings Officer correctly determined that the IEP was not required to identify a methodology.  "'[T]he IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices

are reasonably calculated to provide him with educational benefit.'" *S.M. v. DOE*, 808 F. Supp. 2d 1269, 1279 (quoting *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1122 (9th Cir. 2011)).  Here, the DOE informed Parents as to some of the possible methodologies that would be employed in servicing Student.  *See* Pet. Ex. 63 (May 9 IEP Meeting Audio) 53:30–1:00:50; Resp. Ex. 8 (May 14 Prior Written Notice) at 266 (listing possible methodologies that could instruct services for Student); Hearing Tr. 223:19–226:5.  The DOE was not required to determine or identify any particular methodology in the IEP, and Plaintiffs have offered no legal requirement to the contrary.

## V.   <u>Least Restrictive Environment</u>

Plaintiffs contend that the Decision should be reversed both because the IEP team did not fully discuss Student's least restrictive environment ("LRE") and because the IEP delegated too much decision-making authority to Student's general education and special education teachers for science and social studies. Neither contention has merit.  *See* Decision at 23–24.

The education of a disabled child should take place in the least restrictive environment.  *See* 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate, children with disabilities . . . are [to be] educated with children who are not disabled . . . .").  "While every effort is to be made to place a student in the least restrictive environment, it must be the least restrictive environment which

also meets the child's IEP goals." *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1468 (9th Cir. 1996). In determining the least restrictive environment, the following four factors are considered: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [Student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [Student]." *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994). Plaintiffs do not specifically challenge any of the above factors. Instead, Plaintiffs generally contend that the DOE did not have an appropriate placement discussion. In fact, the record indicates that the DOE engaged in a thorough analysis that incorporated all four of the *Rachel H.* factors.

At the May 7 IEP meeting, the IEP team discussed the academic and non-academic benefits, impacts, and costs of placing Student in the full continuum of possible placements. Resp. Ex. 3 (LRE Worksheet) at 000095–96. The IEP team also discussed the effect Student would have on the general education class and the cost of mainstreaming Student. In its answering brief, the DOE detailed the step-by-step approach taken by the IEP team to discuss all relevant aspects of determining the LRE. Answering Br. at 12–20. Plaintiffs have done little to rebut this evidence, other than to say that the lengthy LRE discussion was not actually thorough or individually tailored. Reply at 8–9.

For example, Plaintiffs point to Student's general education placement in an elective Mandarin class as evidence of an inadequate LRE. However, the audio from the May 7 IEP meeting supports the IEP team's conclusion, as memorialized in the IEP and in other places, that Student's placement in the general education setting for Mandarin and other elective classes "will provide him with access to typically developing peers and appropriate role models to develop and generalize social skills. Additionally, participation in the General Education environment will provide exposure to and the ability to gain increased tolerance to stimuli in various settings and allow him to generalize learned skills while actively participating in classroom activities." Resp. Ex. 8 (May 14, 2012 Prior Written Notice) at 000265; Pet. Ex. 1 (IEP) at 022; Pet. Ex. 62 (May 7 IEP Meeting Audio) 50:53–53:47. This was a Mandarin class, focused on both language and culture, offered to every kindergarten student at Koko Head Elementary. The IEP team carefully considered and concluded that there would be significant benefits to inclusion in this course that outweighed the disadvantages.

Accordingly, the Court concludes that the DOE did a careful analysis of all of the relevant factors to reach Student's LRE. To the extent that Plaintiffs are simply not pleased with the ultimate LRE determination or disagree with specifics, that argument carries no weight. *Virginia S. v. DOE*, 2007 WL 80814,

at *11 (D. Haw. Jan. 8, 2007) (disregarding parents' arguments in which they disagreed with the LRE determination made by the IEP team).

Plaintiffs also contend that specific language in the LRE placement denied Student a FAPE because it was vague and delegated too much authority to the special and general education teachers to make ad hoc decisions related to Student's inclusion for science and social studies courses. The DOE counters that Parents acquiesced to this delegation and that even if it represented a procedural violation, it did not result in the loss of educational opportunity. The Court concludes that Parents did agree to the placement structure for science and social studies and that, regardless, such a placement structure was not inconsistent with LRE principles.

The language at issue within the placement portion of the IEP states that "[Student] will also receive specialized instruction in the general education setting for Science and Social Studies activities as deemed appropriate by his Special Education teacher/Care Coordinator and General Education teacher." Pet. Ex. 1 (IEP) at 022. Although Plaintiffs now assert that this language is inconsistent with a placement in the LRE, at the May 7 IEP meeting, Father expressed his assent to this placement structure. Father stated that this placement "may be the appropriate way to go" and expressed that his only concern with leaving some decision making to the special education and general education

24

teachers was that the DOE might be in a legal predicament because decisions would be made by less than the entire IEP team.  Pet. Ex. 62 (May 7 IEP Meeting Audio) 1:10:1–1:10:33.[2]

Regardless of whether Plaintiffs acquiesced in the decisions of Student's general and special education teachers for science and social studies, this structure is not inconsistent with LRE principles.  In a similar situation in *S.M.*, the IEP provided that the student would participate "to her ability" in specified courses with non-disabled peers.  *S.M. v. DOE*, 808 F. Supp. 2d at 1279–80.  Plaintiffs in that case challenged the "to her ability" language by making essentially the same arguments that Plaintiffs make here.  *Id*. at 1280 ("Plaintiffs contend that the phrase "to her ability" in the February IEP was insufficiently defined and left the degree of the student's participation with her non-disabled peers to the discretion of the teachers.  Plaintiffs assert that the law requires a definitive description of this most important element of the IEP and that the required factors were not used to determine the least restrictive placement." (quotation marks and internal citation omitted)).  However, Judge Kay rejected the plaintiffs' argument in *S.M.*, concluding that the placement language did not in fact give the teachers unfettered discretion:

---

[2]The DOE's answering brief, at pages 14–18, shows Plaintiffs' acknowledgment that this placement structure could benefit Student.  Plaintiffs have not rebutted the DOE's citations.

> The administrative hearings officer concluded that the phrase "to her ability" allows Student the maximum amount of participation with non-disabled peers she is able to have. Interpreted in that way, the February IEP fulfills the statutory goal of the IDEA to ensure the access of children with disabilities to the general education curriculum in the regular classroom, to the maximum extent possible.
>
> Plaintiffs have not shown that the phrase "to her ability" in the February IEP allowed Defendants to prevent Student from participating in the enumerated classes to the maximum extent possible. Absent any such showing, the program's specification that Student would participate with nondisabled peers "to her ability" was reasonably calculated to enable her to receive educational benefits in the least restrictive environment.

*Id*. at 1280 (internal quotation marks, citations, and ellipsis omitted). This holding is equally applicable to the present case. The "as deemed appropriate" language actually enables the special education and general education teachers to provide Student with services in the least restrictive environment. It effectively provides access for Student to the general education curriculum for science and social studies, when it is appropriate, and to the maximum extent possible, based on Student's needs and abilities. In fact, it affords the teachers with necessary flexibility in that particular lessons, and their propriety for Student's inclusion, may not be determined far in advance, and the potential need to convene an IEP team each time such an opportunity arose would, in practical terms, mean that Student would lose out on an educational opportunity. Plaintiffs have failed to prove otherwise. The Court therefore affirms the Hearings Officer's determination

that the placement provision of the IEP left appropriate discretion in the hands of Student's teachers.

Finally, the Court notes that Student's placement was not immutable. Student was coming from PAC, where he had no exposure to nondisabled peers and thus no inclusion opportunities. Although the IEP team concluded that some exposure to the general education population was appropriate, the team also recognized that depending on performance and results, Student's IEP could be adapted accordingly. *See* Pet. Ex. 1 (IEP) at 020–021 ("Monthly team meetings will be scheduled by the Special Education teacher with parents and related service providers to share current information in relation to [Student's] progress, areas of need and programming."); *id.* at 008 ("[Student's] delays in the areas of communication, behavior, social skills, motor skills, speech/language skills, daily living skills, self-help skills and academic skills impact his ability to succeed in the General Education curriculum setting at this time. [Student] may require modification to his programming to support his access to the educational environment because of these needs."). In the meantime, the IEP team placed Student in the least restrictive environment to meet his IEP goals, and Plaintiffs' protestations to the contrary lack sufficient support.

## <u>CONCLUSION</u>

The Administrative Hearings Officer's December 13, 2012 Decision

is hereby AFFIRMED.

IT IS SO ORDERED.

DATED:  April 16, 2014 in Honolulu, Hawai'i.

_____
Derrick K. Watson
United States District Judge